Filed 10/2/13  P. v. Conner CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B236193 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA336892) |
| v. | |
| PRISCILLA CONNER et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Lance A. Ito, Judge.  Appeal dismissed as to Curtis Conner.  Judgment affirmed as modified as to Priscilla Conner.  Judgment affirmed as to Delilah Johnson.

Charlotte E. Costan, under appointment by the Court of Appeal, for Defendant and Appellant Priscilla Conner.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant Curtis Conner.

Chris R. Redburn, under appointment by the Court of Appeal, for Defendant and Appellant Delilah Johnson.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Robert M. Snider, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Curtis Conner and his daughters, Priscilla Conner and Delilah Johnson, appeal from the judgments entered after a jury convicted them each of multiple counts of insurance fraud arising from staged or fabricated car accidents. Curtis,[1] the patriarch of the Conner family and ringleader of the fraudulent scheme, was convicted of 17 counts of insurance fraud (Pen. Code, § 550, subd. (a))[2] and three counts of perjury (§ 118, subd. (a)). Priscilla, a chiropractor, was convicted of 10 counts of insurance fraud; and Delilah, a tow-truck driver employed by the family-owned body shop, MB Automotive, was convicted of four counts of insurance fraud. We affirm the convictions of Priscilla and Delilah. Because Curtis failed to appear at his sentencing and was declared and remains a fugitive, we dismiss his appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Investigation*

In April 2004 Anne Luce, a senior investigator for Bristol West Insurance responsible for reviewing suspicious activity in claims made on vehicle insurance policies, received a referral from one of the company's adjusters raising a concern that a particular accident claim might be fraudulent. In that instance a man who had purchased a non-owner's automobile insurance policy three weeks before a November 2003 collision was driving a 1987 Chevrolet Celebrity registered to Anthony McClure when he rear-ended a 1995 Chevrolet Lumina. The Lumina had been registered earlier that day to the driver, who took the car to MB Automotive for repair. Bristol West issued a check for $2,900 payable to the insured, but the check was cashed by Curtis at Avalon Quik Check. The insured's passengers made personal injury claims through an attorney named Daniel Chien and were treated for their injuries (which included identical complaints and unusual neurological findings) by Priscilla.

---

[1] Because several members of the families share the same last name, we refer to them by their first names for convenience and clarity. (See *Jones v. ConocoPhillips Co.* (2011) 198 Cal.App.4th 1187, 1191, fn. 1.)

[2] Statutory references are to the Penal Code unless otherwise indicated.

Although the personal injury claims were ultimately dropped, the collision triggered Luce's investigation into Curtis's fraudulent scheme. According to Luce, who later testified as an insurance fraud expert at trial and as the custodian of records for Farmers (which had acquired Bristol West and another targeted insurer, Coast National Insurance), indicators of fraud include the use of salvage cars in claims, repeated use of the same car and/or address, multiple claims by people who know each other, policies purchased or vehicles registered near the accident date, repeated appearance of the same lawyers, doctors, chiropractors, clinics and body shops in the same claims, vehicle damage inconsistent with the reported collisions and unchanged odometer readings.

Using an online industry database maintained by the Insurance Services Organization (ISO), Luce discovered McClure's Chevrolet Celebrity had been involved in several other actions within the preceding year and had been flagged by the National Insurance Crime Bureau.[3] Luce's searches of other names connected with the accident disclosed multiple claims involving Conner family members,[4] MB Automotive, 2800 Rodeo Road,[5] the Chien law firm and Avalon Quik Check.[6] Using Bristol West's in-

---

[3] McClure later pleaded guilty to one felony count of insurance fraud. He was recruited into the scheme by Juan Richardson Jr., who was raised with the Conner family in their house at 2800 Rodeo Road in Los Angeles.

[4] In addition to Curtis, Priscilla and Delilah, Curtis's sons Darryl (owner of Academy Tow), Jeffrey (employed by MB Automotive) and Billy Joe (owner of American Tow) were also operatives in the scheme. Priscilla's son Darrel was a claimant, a capper (an operative who sells claims to attorneys and medical professionals) and a stager (who recruited claimants and staged accidents). Juan Richardson Sr., who lived with the Conner family for many years, and Richardson's sons were all claimants, and Juan Jr. worked as a capper and stager for the ring. Billy Lovely, an employee of MB Automotive and American Tow, and members of his family also acted as claimants in the scheme.

[5] Luce dubbed the scheme the "Rodeo Ring" because the address of the Conner family home, 2800 Rodeo Road, was used repeatedly for registration of cars and filing of claims.

[6] Check cashers are used to avoid deposit of insurance payments into bank accounts. The manager of Avalon Quik Check agreed to pre-approve checks presented by Curtis or any family members or friends because Curtis and MB Automotive were such good

house claim files, the ISO database and other resources (including the Department of Motor Vehicles (DMV) online database), Luce identified a group of fraudulent claims she believed were connected. She presented the claims to the California Department of Insurance, which confirmed an ongoing investigation of these related claims but closed the investigation without action because of a lack of resources.

In May 2005 Luce presented about 20 claims to the Los Angeles Police Department (LAPD). LAPD eventually accepted a number of the claims for possible prosecution in November 2005. After investigating the claims for more than two years, detectives from LAPD arrested 46 suspects based on their connection to the Rodeo Ring, including Curtis, Priscilla and Delilah.

2. *Trial Proceedings*

Charges were initially filed against 42 defendants. By early 2009, after a lengthy preliminary hearing and multiple negotiated resolutions, 13 defendants were held to answer charges; by November 2010 only six remained scheduled for trial. The amended information on which the case was tried contained 26 counts of insurance fraud against the six defendants and three perjury counts against Curtis.[7] Priscilla was charged with 14 counts of insurance fraud; Delilah was charged with four counts.

In November 2010 Priscilla moved to sever her trial from that of the remaining defendants on the ground of jury confusion and prejudicial association with other defendants. The trial court denied the motion.

The People presented their case through LAPD Detective Juan Camacho, who relied on public records and witness statements, and investigators from Farmers (Luce), State Farm Insurance Co., Mercury Insurance Co. and Allstate Insurance Co. These witnesses established that many of the reported collisions involved one vehicle rear-ending a second, which then rear-ended a third. Several vehicles appeared in multiple

---

customers. Curtis was able to call ahead to ensure the check would be cashed for the person presenting it, and Avalon habitually waived the co-payee's presence.

[7]    The perjury counts were based on Curtis's fraudulent applications for driver's licenses and identification cards.

4

claims. With respect to five of the cars involved in multiple claims, the odometer remained unchanged, suggesting these collisions were fabricated and never occurred. MB Automotive was almost always the repair shop for both parties in the collision, and the drivers and passengers were often Conner family members or coworkers. MB Automotive typically obtained the vehicles through lien sales or salvage and then sold them to employees or family members. Three different attorneys were shown to have been involved in the ring, all of whom were referred claims by a common office administrator, Jae Chang.

With respect to the four counts against Delilah, she was the registered owner or driver of three different vehicles rear-ended in four separate incidents by other persons linked to the scheme. In two of the accidents the car driven by or registered to Delilah collided with a 1996 Nissan 240SX registered to Robert Williams, an alias used by Curtis. A 1996 Dodge Caravan driven by Delilah (and registered in her name two weeks previously) was totaled in a December 2003 collision involving the Nissan. In May 2004 the same Caravan was rear-ended again, and Delilah (using the name Dee Johnson) collected a $4,200 check that was cashed at Avalon Quik Check.[8] A fourth collision in July 2006 involved a salvaged vehicle gifted to Delilah by Michael Brown (of MB Automotive) and insured by her a month earlier. She and her three passengers were compensated for substantial personal injury claims. All vehicles involved in these collisions were inspected by MB Automotive, which provided estimates for the property damage claims.

The evidence showed that Priscilla treated approximately 15 of the 50 drivers and passengers who made claims for injuries in the charged incidents, including claimants injured in different vehicles involved in the same accident. A board-certified chiropractic orthopedist testified that all of Priscilla's reports contained fabricated narratives. Her physical findings were identical among patients; for instance, cervical spine findings

---

[8]     A State Farm investigator reviewing the accident after the claim had been paid opined the damage to the cars involved was not consistent with the details of the reported collision. He concluded the claim was fraudulent and should not have been paid.

5

were identical for eight different patients in nine collisions and appeared to be constructed by cutting and pasting identical text. She also coded patient visits to produce higher billing, including levels reserved for patients with some risk of morbidity, even though X-rays were never taken.

The court also admitted evidence, over Priscilla's objection, of statements she made at an October 2007 deposition taken by Farmers Insurance that Luce attended. Discussing injuries to two patients whose claims had been submitted by Irvin Gevurtz, one of the attorneys associated with the fraud scheme, Priscilla stated that each of the doctors at the La Tijera clinic where she worked administered his or her own office. She handled her own paperwork and billings but later sent some files to outside services. She documented treatment on forms with daily notes and later transferred information from her charts to billing forms. She reviewed her typewritten reports before she signed them.

After the People rested, the charges against Darryl Conner (Curtis's son and Priscilla and Delilah's brother) were dismissed based on insufficient evidence. (§ 1118.1.) When trial resumed, Juror 8 sent the judge a note stating he had seen Darryl driving his tow truck shortly after the dismissal. Darryl stopped the truck and, after explaining the charges against him had been dismissed, greeted Juror 8. At a hearing about the encounter Juror 8 admitted he had told Juror 9 about the event. Juror 9 told the court Juror 8 had described the incident and had acknowledged shaking Darryl's hand and congratulating him. Juror 9 also stated he had repeated the story to Juror 6. After discussing the matter with counsel, the court discharged Juror 8 but declined to discharge Jurors 6 and 9.

None of the defendants testified at trial. Priscilla defended the charges on the theory the medical reports apparently signed by her had been forged and she had no knowledge the claims were fraudulent. Juan Richardson Jr. testified on her behalf: Priscilla was his god-aunt, and they both lived at 2800 Rodeo Road. Juan Jr. acknowledged working as a capper and stager of accidents when he was employed as a tow truck driver by American Tow. He later worked as a stager for Chang, earning $700 in cash for each passenger. He acknowledged targeting innocent drivers in staged collisions, as well as drivers he had solicited. Juan Jr. directed McClure and others to

6

Priscilla for care but never told her the collisions had been staged or the injuries faked. Richardson believed Chang fabricated medical reports and, on at least one occasion, had forged Priscilla's signature. Priscilla also presented evidence that signatures can be forged through the use of software like Adobe Photoshop.

### 3. *Verdicts and Sentencing*

The jury convicted Curtis on all counts and, as to the insurance fraud counts, found true the special allegation of a taking in excess of $100,000 (§ 186.11, subd. (a)). Priscilla was convicted on 10 of 14 counts with a true finding on the same special allegation. Delilah was convicted on all four counts charged.

Curtis failed to appear for sentencing and was sentenced in absentia to an aggregate term in state prison of 26 years. Priscilla was sentenced to an aggregate term of 14 years in state prison, consisting of three years on the principal term (count 15), plus a two-year excessive-taking enhancement under section 186.11, subdivision (a), and consecutive one-year subordinate terms (one-third the middle term) on the remaining nine counts. Delilah was sentenced to an aggregate term of six years in county jail, consisting of the middle term of three years on the principal term (count 25) and consecutive one-year terms on the three remaining counts. In addition to other fines and assessments, Curtis and Priscilla were each fined $500,000 under section 550, subdivision (a); and Delilah was fined $10,000 under the same section. Curtis was ordered to pay $250,669 in direct victim restitution. Priscilla was also ordered to pay $271,220 and Delilah $78,681 in direct victim restitution.

## CONTENTIONS

Priscilla contends the trial court abused its discretion in denying her motion to sever her trial from that of her codefendants, violated her Sixth Amendment right of confrontation by admitting insurance fraud reports as substantive evidence of guilt, denied her a fair trial by refusing to dismiss Jurors 6 and 9 and abused its discretion by allowing testimony about her "so-called admissions" at the 2007 deposition as evidence against her on charges preceding that date. She also contends her convictions were not supported by substantial evidence.

Delilah contends the convictions on three of the counts against her, which she asserts were based on allegations of conspiracy, must be reversed because of the lack of proof of overt acts. She also contends the court deprived her of her right to a jury trial in imposing victim restitution fines and erred by failing to instruct the jury on the legal meaning of intent to defraud.

Curtis contends the court erred in imposing a two-year, rather than a one-year, enhancement under section 186.11, subdivision (a). He also contends the minute order from the sentencing hearing should be amended to reflect the fact he was not sentenced to a term of seven years for count one. Curtis also contends this court should deny the People's motion to dismiss under the fugitive disentitlement doctrine based on the ground of judicial efficiency.

## DISCUSSION

1. *Curtis's Appeal Is Dismissed*

"'That the court, independent of statutory authority, has power to dismiss the appeal of an appellant who is a fugitive from justice has long been accepted as a proper exercise of the jurisdiction of the appellate courts of this state.'" (*Polanski v. Superior Court* (2009) 180 Cal.App.4th 507, 531 (*Polanski*); accord, *People v. Puluc-Sique* (2010) 182 Cal.App.4th 894, 897; *People v. Kubby* (2002) 97 Cal.App.4th 619, 622.) "While the courts' rationale for their power to dismiss the criminal appeal of a fugitive from justice has been variously stated, it has ultimately been premised on the proposition that a fugitive has no right to ask the courts to review the very judgment that the fugitive flouts." (*Kubby,* at p. 623; accord, *Polanski,* at p. 531 ["'[a] party to an action cannot, with right or reason, ask the aid and assistance of a court in hearing his demands while he stands in an attitude of contempt to legal orders and processes of the courts of this state'"].)

"The disentitlement doctrine 'serves an important deterrent function' (*Ortega-Rodriguez v. United States* (1993) 507 U.S. 234, 242 [113 S.Ct. 1199, 122 L.Ed.2d 581] (*Ortega-Rodriguez*)): it discourages the felony of escape and encourages voluntary surrenders. [Citation.] Disentitlement also '"promotes the efficient, dignified operation"

of the courts.' [Citation.] Finally, in appropriate cases, disentitlement protects the [P]eople from prejudice by the passage of time in the event of a reversal on appeal. (*Ortega-Rodriguez,* at p. 249 [disentitlement may be 'an appropriate response' where 'a long escape . . . so delay[s] the onset of appellate proceedings that the Government would be prejudiced in locating witnesses and presenting evidence at retrial after a successful appeal'] [citation].)" (*Polanski, supra,* 180 Cal.App.4th at p. 533.)

Although fugitive disentitlement remains "a discretionary tool of the courts that may only be applied when the balance of all equitable concerns leads the court to conclude that it is a proper sanction for a party's flight" (*Polanski, supra,* 180 Cal.App.4th at p. 533), we perceive no reason not to apply the doctrine to dismiss Curtis's appeal in this case. Curtis is now 79 years old. Even were we inclined to consider the issues he raises on appeal, an outcome in his favor would have minimal effect on the length of time he serves under his sentence of 26 years, which, were he to be recaptured and incarcerated, will likely extend beyond the end of his natural life.

2. *The Trial Court Did Not Abuse Its Discretion in Denying Priscilla's Motion To Sever or Violate Her Constitutional Right to Due Process*

"When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly unless the court orders separate trials." (§ 1098; see *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40 ["[j]oint trials are favored because they 'promote [economy and] efficiency' and '"serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts"'"].) [9]

---

[9] The efficiency and benefits of a joint trial were described in *People v. Bean* (1988) 46 Cal.3d 919, 939-940: "A unitary trial requires a single courtroom, judge, and court attachés. Only one group of jurors need serve, and the expenditure of time for jury voir dire and trial is greatly reduced over that required were the cases separately tried. In addition, the public is served by the reduced delay on disposition of criminal charges both in trial and through the appellate process." (Accord, *People v. Soper* (2009) 45 Cal.4th 759, 772; see *People v. Ochoa* (1998) 19 Cal.4th 353, 409 [joinder "'ordinarily avoids needless harassment of the defendant and the waste of public funds which may result if the same general facts were to be tried in two or more separate trials [citation], and in several respects separate trials would result in the same factual issues being presented in both trials'"].)

Thus, there is a legislative (and judicial) preference for joint trials when authorized. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 150.)

When a joint trial is authorized under section 1098, the trial court retains discretion to order separate trials if necessary to avoid undue prejudice to one of the defendants. (*People v. Letner and Tobin, supra,* 50 Cal.4th at p. 150 ["'the court may, in its discretion, order separate trials "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony"'"]; accord, *People v. Box* (2000) 23 Cal.4th 1153, 1195, disapproved on another ground in *People v. Martinez* (2010) 47 Cal.4th 911, 948, fn. 10; see *People v. Lewis* (2008) 43 Cal.4th 415, 452 ["[t]he court may, in its discretion, order separate trials if, among other reasons, there is an incriminating confession by one defendant that implicates a codefendant, or if the defendants will present conflicting defenses"]; see also *People v. Carter* (2005) 36 Cal.4th 1114, 1153 ["'[r]efusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case'"].)

A court's denial of a motion for severance is reviewed for an abuse of discretion, "judged on the facts as they appeared at the time of ruling." (*People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 41; see *People v. Balderas* (1985) 41 Cal.3d 144, 171 [appellate court reviews trial court's denial of pretrial severance motion based on the facts known and the showing made at the time of the motion itself].) "Even if a trial court abuses its discretion in failing to grant severance, reversal is required only upon a showing that, to a reasonable probability, the defendant would have received a more favorable result in a separate trial." (*Coffman and Marlow,* at p. 41.) Finally, though a

trial court's ruling on the motion to sever was proper when made, a reviewing court "'may nevertheless reverse a conviction where, because of the consolidation, a gross unfairness has occurred such to deprive the defendant of a fair trial or due process of law.'" (*People v. Cleveland* (2004) 32 Cal.4th 704, 726; accord, *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 998.)

Priscilla contends the court should have severed her trial from that of the other defendants (or, in the alternative, impaneled two juries) because she claims she was unfairly prejudiced through association with her family. As Priscilla recognized, the People intended to introduce evidence of Curtis's and Delilah's former convictions for insurance fraud,[10] as well as a videotape of a pretrial police interview of Curtis and Delilah that Priscilla claims would not have been admissible against her in a separate trial. In addition, Priscilla argues, the evidence against her was weak and susceptible to her defense that the medical reports had been forged without her knowledge. Indeed, Priscilla points out the jury acquitted her on four of the 14 counts against her—the ones in which she was the sole defendant.

Notwithstanding Priscilla's contention she was convicted because of her association with her family, this case presented a textbook example of the efficiencies of joint trials. (See *People v. Keenan* (1988) 46 Cal.3d 478, 499-500 ["'classic' case for joint trial is presented when defendants are charged with common crimes involving common events and victims"].) Under circumstances similar to those here, then-Court of Appeal Justice Corrigan, writing for Division Three of the First District, rejected a defendant's claim the trial court's failure to sever his trial from that of his codefendant had violated his constitutional rights. (See *People v. Singh* (1995) 37 Cal.App.4th 1343, 1374-1375.) In *Singh* the defendant chiropractor who was convicted of fraudulent insurance billings contended he had been unduly prejudiced by the evidence of his codefendant's conduct as the driver and stager of multiple automobile accidents and

---

[10] In 1990 Priscilla was charged with one count of forgery but was acquitted. Curtis and Delilah were convicted of fraud during the same prosecution.

11

preparer of fraudulent declarations.  The court concluded the evidence was not unduly prejudicial, was in fact probative, and, in light of the Legislature's preference for joint trials, was "a '"classic"' case" warranting joint trial because of the "'common crimes involving common events and victims.'"  (*Id*. at p. 1374.)

In the instant case the People presented 50 witnesses and more than 700 exhibits over the course of three months.  Of the 29 counts tried against five defendants, Priscilla was a defendant in 14, 10 of which were filed jointly against other defendants.  Her individually signed medical reports and bills linked her to multiple collisions, including those in which other members of the ring were charged.  The evidence against her was no weaker than that against other defendants; indeed, her brother Darryl was dismissed at the close of the People's case because the evidence failed to implicate him.  In short, the cost of separately trying the charges against her would have been, as the People argue, staggering, and Priscilla has failed to establish the "substantial danger of prejudice" that might have justified separate trials.  (*People v. Vines* (2011) 51 Cal.4th 830, 855.)  There was no abuse of discretion in the denial of her motion.  We are equally convinced the denial of the motion to sever did not result in "gross unfairness" to Priscilla so as to violate her right of due process.  (See *People v. Cleveland*, *supra,* 32 Cal.4th at p. 726.)

3. *Priscilla's Sixth Amendment Right of Confrontation Was Not Violated By Admission of the Contents of the Farmers Insurance Claims Files as Business Records*

The confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  (U.S. Const., 6th Amend.)  The purpose of that clause is to "ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."  (*Maryland v. Craig* (1990) 497 U.S. 836, 845 [110 S.Ct. 3157, 111 L.Ed.2d 666].)  "A hearsay statement that otherwise satisfies a statutory exception may be admitted against a criminal defendant without violating the confrontation clause as long as the statement is not 'testimonial.'"  (*People v. Lopez* (2012) 55 Cal.4th 569, 590 (*Lopez*), citing *Crawford v. Washington* (2004) 541 U.S. 36

12

[124 S.Ct. 1354, 158 L.Ed.2d 177] (*Crawford*).)  Thus, "[a]dmission of a relevant business record does not violate the confrontation clause unless its contents qualify as a testimonial statement.  The Supreme Court cases counsel that it is the formality of the statement and the primary purpose for which it was made that resolve that question.  A notation made for the primary purpose of 'the administration of an entity's affairs' [citation] is not testimonial." (*Lopez,* at p. 589, citing *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 324 [129 S.Ct. 2527, 174 L.Ed.2d 314] (*Melendez-Diaz*).)[11]

Since its decision in *Crawford* the Supreme Court has struggled to identify a coherent test for courts to apply in identifying those statements that are testimonial in nature.  (See *Melendez-Diaz, supra,* 557 U.S. at pp. 310, 324 [finding evidence certificates prepared by laboratory analyst attesting substance was cocaine were testimonial; "[w]hether or not they qualify as business or official records, the analysts' statements here—prepared specifically for use at petitioner's trial—were testimony against petitioner, and the analysts were subject to confrontation under the Sixth Amendment"]; *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705, 180 L.Ed.2d 610] [certified blood alcohol report prepared by nontestifying laboratory analyst was testimonial]; *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221, 183 L.Ed.2d 89] (plur. opn. by Alito, J.) (*Williams*) [uncertified results of DNA analysis performed by nontestifying laboratory analysts were nontestimonial; primary purpose of report was to assist in identification of rapist not to convict him].)

Wrestling with the same issue, the California Supreme Court recently issued a trio of decisions examining the various approaches of the United States Supreme Court

---

[11]     In *Crawford* the United States Supreme Court concluded that *nontestimonial* hearsay remains subject to state hearsay law and may be exempted from confrontation clause scrutiny entirely.  (*Crawford, supra,* 541 U.S. at p. 68.)  But where *testimonial* hearsay is involved, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."  (*Ibid.*)  While the Supreme Court declined to provide a comprehensive definition of "'testimonial'" (*ibid.*), the term includes "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'"  (*Id.* at p. 52.)

justices in these cases and concluded: "Although the high court has not agreed on a definition of 'testimonial,' a review of [its] decisions indicates that a statement is testimonial when two critical components are present. [¶] First, to be testimonial the out-of-court statement must have been made with some degree of formality or solemnity. [Citations.] The degree of formality required, however, remains a subject of dispute in the United States Supreme Court. [Citations.] [¶] Second, all nine high court justices agree that an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution, but they do not agree on what the statement's primary purpose must be." (*Lopez, supra,* 55 Cal.4th at pp. 581-582; see *People v. Mercado* (2013) 216 Cal.App.4th 67, 86.)

In *Lopez* the Court treated the first prong—the degree of formality—as a controlling threshold determination: Because the blood alcohol report at issue had not been "made with the requisite degree of formality or solemnity to be considered testimonial," the Court concluded it need not consider the reason the report had been generated. (*Lopez, supra*, 55 Cal.4th at p. 582.)[12] The Court took a slightly different tack in *People v. Dungo* (2012) 55 Cal.4th 608: "We begin with the issue of formality. An autopsy report typically contains two types of statements: (1) statements describing the pathologist's anatomical and physiological observations about the condition of the body, and (2) statements setting forth the pathologist's conclusions as to the cause of the victim's death. The out-of-court statements at issue here . . . fall into the first of the two categories. These statements, which merely record objective facts, are less formal than statements setting forth a pathologist's expert conclusions. They are comparable to

---

[12]     *Lopez* is one of three cases issued the same day addressing confrontation clause challenges to the admission of technical reports whose contents were described by someone other than the person conducting the test. The others are *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*) and *People v. Rutterschmidt* (2012) 55 Cal.4th 650 (*Rutterschmidt*). Justice Liu, who dissented from the decision in *Lopez*, disagreed with the Court's reductive analysis of *Williams* that emphasized the formal nature of the statement and argued "the proper determination of a statement's formality for purposes of the confrontation clause is closely intertwined with the nature and purpose of the process that produced the statement." (*Lopez, supra*, 55 Cal.4th at p. 594 (dis. opn. of Liu, J.).)

14

observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment. Such observations are not testimonial in nature." (*Id.* at p. 619.) Notwithstanding its threshold conclusion the autopsy report consisted of non-testimonial statements, the Court continued: "The usefulness of autopsy reports, including the one at issue here, is not limited to criminal investigation and prosecution; such reports serve many other equally important purposes. For example, the decedent's relatives may use an autopsy report in determining whether to file an action for wrongful death. And an insurance company may use an autopsy report in determining whether a particular death is covered by one of its policies. [Citation.] Also, in certain cases an autopsy report may satisfy the public's interest in knowing the cause of death, particularly when (as here) the death was reported in the local media. In addition, an autopsy report may provide answers to grieving family members. [¶] In short, criminal investigation was not the *primary* purpose for the autopsy report's description of the condition of [the] body; it was only one of several purposes. The presence of a detective at the autopsy and the statutory requirement that suspicious findings be reported to law enforcement do not change that conclusion. The autopsy continued to serve several purposes, only one of which was criminal investigation. The autopsy report itself was simply an official explanation of an unusual death, and such official records are ordinarily not testimonial." (*Id.* at pp. 620-621; accord, *People v. Mercado, supra,* 216 Cal.App.4th at pp. 88-90.)[13]

---

[13]     *Dungo* by no means ended the debate over this aspect of the confrontation clause: Justice Corrigan, joined by Justice Liu, dissented from the analysis in *Dungo*, arguing the majority had, in this instance, "conflate[d] the two prongs of the testimonial determination: formality and primary purpose" by creating a distinction between conclusions (which it treated as formal) and observations (which it viewed as informal). (*Dungo, supra*, 55 Cal.4th at p. 639 (dis. opn. of Corrigan, J.).) In the dissent's view the autopsy report, although not certified, was signed and dated and was "manifestly an official report." (*Id.* at p. 641.) Moreover, the majority's "blanket approach" on the second prong relating to purpose—that is, finding the statements nontestimonial because they were created for multiple purposes—improperly eschewed the "highly fact dependent" inquiry required by Supreme Court precedent. (*Id.* at p. 644.) Justice Corrigan suggested the appropriate inquiry should instead be "whether, viewed

15

No matter how courts apply these decisions in the future, it is unlikely the records objected to in this case would be viewed as testimonial. Priscilla describes these records as "reports in which insurance investigators and adjustors alleged that the accidents were staged and the claims were fraudulent" and claims the investigators were acting as a "de facto arm of the police." These reports, however, although automatically part of the record on appeal (Cal. Rules of Court, rule 8.320(e)), were not transmitted to this court (see *id.,* rule 8.224), and the only factual description contained in the record is the court reporter's list of exhibits admitted during Luce's testimony. The list includes insurance applications, correspondence between the insurers and counsel and claimants, damage appraisals and photographs, tow bills, medical reports and billing records, claim checks, DMV records and other documents that appear to be routine records maintained in the Farmers claim files. None of these documents may be considered "testimonial" as applied in *Williams, Lopez* or *Dungo*: They were not created with any degree of formality, and they served a plain business function unrelated to the ultimate criminal prosecution.

There are two exceptions: an audio recording (with transcript) of an interview conducted by a Bristol West employee with Delilah Johnson in July 2006, a day after

objectively, a sufficiently formal statement was made for the primary purpose of establishing or proving past facts for possible use in a criminal trial." (*Ibid.*)

Justice Chin, however, who wrote separately in support of the decision considered it key that the opinion concerning the manner of death came from the *testifying* expert who was subject to full cross-examination and not from the report, which was not placed in evidence. (*Dungo, supra,* 55 Cal.4th at p. 632 (conc. opn. of Chin, J.).) In Justice Chin's view the statements in the autopsy report concerning the condition of the victim's body were "objective observations of the type routinely placed into autopsy reports, whether or not a specific suspect exists. They [were] not statements with a primary purpose of accusing defendant, or anyone else, of criminal conduct. The fact that the larynx and hyoid bone were not broken, like most of the other observations memorialized in the report, 'was not inherently inculpatory.' [Citation.] There was no prospect of fabrication or incentive to produce anything other than an accurate description of the state of the body." (*Ibid*.; see *People v. Barba* (2013) 215 Cal.App.4th 712, 738.)

16

Delilah reported an accident; and a document prepared by Luce entitled "Bristol West/Coast National Insurance Claim Investigation Timelines."

Neither of these records, however, poses a confrontation clause issue. The recording, which presumably contains statements by the employee as well as Delilah, is not necessarily hearsay as the statements were not admitted for their truth but for the purpose of establishing a claim was made. (See Evid. Code, § 1200; *People v. Harvey* (1991) 233 Cal.App.3d 1206, 1220 ["[i]f the statement is received as proof of something other than the truth of the statement itself, it is not hearsay"]; *People v. Henry* (1948) 86 Cal.App.2d 785, 789 ["[t]here is a well-established exception or departure from the hearsay rule applying to cases in which the very fact in controversy is whether certain things were said or done and not as to whether these things were true or false"], quoted in *Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 109.) Luce's report, on the other hand, might properly be considered testimonial, but she testified at trial and was thoroughly cross-examined about her report.

In sum, Priscilla has failed to identify the reports she claims violated her right of confrontation. Even assuming one of the exhibits listed might have been testimonial in nature and was not created by Luce,[14] the possible violation of Priscilla's right of confrontation through that single document would constitute harmless error. As the Court explained in *People v. Pearson* (2013) 56 Cal.4th 393, "'[W]e need not decide whether, following our decision in *Dungo,* the evidence here is testimonial because any error in the admission of the autopsy reports and [the doctor's] testimony was harmless beyond a reasonable doubt. [Citations.] [¶] "The beyond-a-reasonable-doubt standard of *Chapman*[15] 'requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.] 'To say that an error did not contribute to the ensuing verdict is . . .

---

[14]     The People also point out that Detective Camacho's testimony in large part tracked Luce's testimony. The testimony of both witnesses was based on the documents contained in the insurance claim files, and both witnesses were cross-examined.

[15]     *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705].

17

to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is 'whether the . . . verdict actually rendered in this trial was surely unattributable to the error.'"'" (*People v. Mercado, supra,* 216 Cal.App.4th at p. 91, quoting *Pearson,* at p. 463; see also *Rutterschmidt, supra,* 55 Cal.4th at p. 661 ["[v]iolation of the Sixth Amendment's confrontation right requires reversal of the judgment against a criminal defendant unless the prosecution can show 'beyond a reasonable doubt' that the error was harmless"].)

4. *The Trial Court Did Not Err in Admitting Priscilla's 2007 Deposition Testimony About Her Handling of Reports and Billing Statements*

At trial the People proffered statements Priscilla made during a 2007 deposition relating to the manner in which she prepared treatment reports and billing statements. Priscilla objected on the grounds of relevance and hearsay. The trial court overruled the objections, allowing introduction of testimony concerning Priscilla's preparation of reports and billing statements. Priscilla renews her objections and additionally argues admission of the testimony violated her privilege against self-incrimination. "We review the trial court's determination as to the admissibility of evidence (including the application of the exceptions to the hearsay rule) for abuse of discretion [citations] and the legal question whether admission of the evidence was constitutional de novo." (*People v. Mayo* (2006) 140 Cal.App.4th 535, 553; see also *People v. Lee* (2011) 51 Cal.4th 620, 643 ["[r]ulings regarding relevancy and Evidence Code section 352 are reviewed under an abuse of discretion standard"]; *People v. Seijas* (2005) 36 Cal.4th 291, 304 [proper standard for review of constitutional challenges is "'independent, de novo, review rather than the more deferential abuse of discretion test'"].)

Priscilla first contends a deposition authorized in civil proceedings under Code of Civil Procedure section 2025.620 may only be used as contemplated in that statute, that is, by a party to the action in the same case. (See Code Civ. Proc., § 2025.620, subd. (a) ["[a]ny *party* may use a deposition for the purpose of contradicting or impeaching the

18

testimony of the deponent as a witness, or for any other purpose permitted by the Evidence Code," italics added].) This purported limitation on the use of deposition testimony in other actions has no support in the case law. As Evidence Code section 351 provides, "all relevant evidence is admissible," subject to statutory exceptions or constitutional prohibitions. The question instead is whether the deposition testimony, which was presented for its truth in support of the People's case, is admissible pursuant to a hearsay exception and was not otherwise prohibited by the federal or state constitution. (See Evid. Code, §§ 1200, 1201.)

The statements of a party are admissible under Evidence Code section 1220,[16] which has been broadly construed. (See *People v. Horning* (2004) 34 Cal.4th 871, 898 & fn. 5 ["[t]he hearsay rule does not bar statements when offered against the declarant in an action in which the declarant is a party"; § 1220 "covers all *statements* of a party, whether or not they might otherwise be characterized as admissions"]; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1049 ["The evidence was of statements, defendant was the declarant, the statements were offered against him, and he was a party to the action. Accordingly, the hearsay rule does not make the statements inadmissible."].) Priscilla's testimony about how she ordinarily documented and billed for treatment in 2007 was plainly relevant to the charges against her even if the charges predated her testimony; that concern went to the weight the jurors might have placed on the evidence, not its admissibility. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1115-1116 ["we must assume that the jurors were intelligent people and that they understood and took into account the differences identified . . . on appeal"].)

Attempting to invoke a constitutional bar to the testimony, Priscilla argues use of statements from her civil deposition as substantive evidence in an unrelated criminal case eviscerated her privilege against self-incrimination; in other words, the People should not

---

[16] Evidence Code section 1220 provides: "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity."

19

be permitted to exploit testimony they could not have compelled in the criminal proceeding itself.  Although Priscilla did not raise this issue below and has forfeited it, simple reflection reveals the fallacy of her theory:  The Fifth Amendment bars the *compulsion* of self-incriminating testimony.  (See, e.g., *Maldonado v. Superior Court* (2012) 53 Cal.4th 1112, 1128 ["'In the Fifth Amendment context, we have created *prophylactic rules* designed to safeguard the core constitutional right protected by the Self-Incrimination Clause.  [Citations.]  Among these rules is an evidentiary privilege that protects witnesses . . .' who invoke their Fifth Amendment rights 'from being forced to give incriminating testimony, even in noncriminal cases, unless that testimony has been immunized from use and derivative use in a future criminal proceeding before it is compelled.'"]; *People v. Haley* (2004) 34 Cal.4th 283, 303 ["""Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. . . .  There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make.  Volunteered statements of any kind are not barred by the Fifth Amendment . . . .""""]; *People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1286 ["[t]he privilege against self-incrimination arises only when testimony is *compelled*"].)  Priscilla was not compelled to testify at her deposition; she freely and voluntarily testified about her office practices.  The Fifth Amendment did not bar use of those statements at trial.[17]

---

[17]     Priscilla also contends the statements—which were made in 2007, nearly two years after the latest charge at issue in the case—were barred as subsequent remedial measures under Evidence Code section 1151.  This issue, too, was not raised at trial and is forfeited on appeal.  (See *People v. Williams* (2008) 43 Cal.4th 584, 620 ["""questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal"""]; see generally Evid. Code, § 353, subd. (a) ["[a] verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless:  [¶] . . . [t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"].)

5. *The Trial Court Did Not Abuse Its Discretion in Declining To Discharge the Two Additional Jurors*

"'[T]he right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to a trial by jury guaranteed by the constitution.'" (*People v. Earp* (1999) 20 Cal.4th 826, 852; see *In re Hitchings* (1993) 6 Cal.4th 97, 110 ["one accused of a crime has a constitutional right to a trial by impartial jurors"].) Priscilla contends the trial court's failure to replace Jurors 6 and 9, who learned about the contact between Juror 8 and Darryl Conner and could have inferred from his dismissal that the remaining defendants were guilty, violated her right to trial by impartial jurors.

The trial court may discharge a juror for good cause during deliberations if it finds the juror is unable to perform his or her duty. (See *People v. Lomax* (2010) 49 Cal.4th 530, 589; *People v. Bennett* (2009) 45 Cal.4th 577, 621 ["trial court 'has broad discretion to investigate and remove a juror in the midst of trial where it finds that, for any reason, the juror is no longer able or qualified to serve'"].) Section 1089 provides, if a juror upon "good cause shown to the court" is found to be unable to perform his or her duty, the court may order the juror discharged and an alternate juror seated.[18] Good cause includes a "juror's 'unwillingness to engage in the deliberative process'" and "refusal to follow the law set forth in the instructions . . . ." (*People v. Alexander* (2010) 49 Cal.4th 846, 926.) "'[A]n inquiry sufficient to determine the facts is required whenever the court is

In any event, like Priscilla's claim that use of the deposition testimony violated her privilege against self-incrimination, this contention borders the frivolous. Priscilla's testimony about her billing and recordkeeping practices was admitted to show how she personally maintained her records during the relevant time period, not to prove that she changed those procedures as evidence of prior culpable conduct. (See *Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1169 [evidence of subsequent measures admissible when offered to show ownership or control].)

[18] Section 1089 states in part, "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors."

21

put on notice that good cause to discharge a juror may exist.'" (*People v. Williams* (1997) 16 Cal.4th 153, 231.)

"'We assess the effect of out-of-court information upon the jury in the following manner. When juror misconduct involves the receipt of information about a party or the case from extraneous sources, the verdict will be set aside only if there appears a substantial likelihood of juror bias. [Citation.] Such bias may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not "inherently" prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was "actually biased" against the defendant. If we find a substantial likelihood that a juror was actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict, because a biased adjudicator is one of the few structural trial defects that compel reversal without application of a harmless error standard.'" (*In re Boyette* (2013) 56 Cal.4th 866, 890-891 (*Boyette*), quoting *People v. Nesler* (1997) 16 Cal.4th 561, 578-579 (*Nesler*).) "Although juror misconduct raises a presumption of prejudice [citations], we determine whether an individual verdict must be reversed for jury misconduct by applying a substantial likelihood test. That is, the 'presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant.'" (*Boyette,* at pp. 889-890.)[19]

---

[19] Whether juror misconduct has occurred is "a legal question we review independently." (*People v. Collins* (2010) 49 Cal.4th 175, 242). However, we "'accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.'" (*Ibid.*) Similarly, whether misconduct is prejudicial is reviewed independently as a mixed question of law and fact when the trial court denies a motion for new trial. (*People v. Ault* (2004) 33 Cal.4th 1250, 1260-1263.)

The episode recounted by Juror 8 falls within the second of the *Nesler* categories because it involves "information [that] is not 'inherently' prejudicial." (*Boyette, supra,* 56 Cal.4th at p. 890; *Nesler, supra,* 16 Cal.App.4th at p. 578.) According to Juror 8, he had been walking along the street when Darryl, driving a tow truck, pulled up next to him and stopped abruptly. When Juror 8 seemed reticent to approach Darryl, Darryl explained he was no longer a defendant and was back in business. It was at that point that Juror 8 congratulated Darryl and shook his hand. Nothing else was said; the two men did not discuss anything related to the case. At the next court session Juror 8 asked Juror 9 whether he should disclose the incident to the court, which he did. Juror 9 confirmed that Juror 8 had described the conversation with Darryl to him and that he in turn had mentioned the incident only to Juror 6. Juror 6 told the court he understood Juror 8 had seen Darryl, who had greeted him, but nothing else had happened. Juror 6 had not mentioned the incident to anyone else. The court directed each juror not to discuss the matter further, and each man told the court the incident would have no impact on his ability to be fair and impartial. Priscilla raises no challenge to these facts.

In a discussion following the court's questioning of the jurors, the prosecutor argued Juror 8 should be replaced because he had been less than forthcoming about the episode. Curtis's counsel responded that none of the three should be dismissed and acknowledged the potential for prejudice was slight because there had been almost no evidence against Darryl during the two-and-a-half-month trial. Further, because of the lengthy trial, there was danger of running out of alternates and precipitating a mistrial. Delilah's counsel agreed with Curtis's counsel. Both stated, however, that if one was discharged, all three should be discharged. Priscilla's counsel criticized the prosecutor for characterizing Juror 8 as dishonest and argued he had acted responsibly. After this discussion, the court concluded it would discharge Juror 8 but retain the other two jurors and noted the objections of defense counsel for the record. After the court had discharged Juror 8, Curtis's counsel made a motion to discharge Juror 9 as well. Two of the three remaining defense lawyers, including Priscilla's counsel, joined in the motion,

23

which the court denied. The court subsequently instructed the jury not to "speculate or guess as to why the other person is not being prosecuted in this trial."

As these proceedings demonstrate, defense counsel generally agreed there was little inherent prejudice associated with the accidental contact between Darryl and Juror 8. The second-hand receipt of information about the contact by two other jurors had even less potential for prejudice. Under these circumstances, we see no "substantial likelihood" that either of the two jurors was actually biased against the remaining defendants because of Juror 8's contact with Darryl.

6. *Substantial Evidence Supports Priscilla's Convictions*

To assess a claim of insufficient evidence in a criminal case, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Priscilla contends the evidence was insufficient to support the convictions because it failed to establish she did anything more than treat patients she believed presented real

24

injuries.[20]  In other words, she challenges the necessary finding she intended to defraud the insurers when she billed them for her services.

However, "'"[i]t is well established that criminal intent may be inferred from the general circumstances surrounding the transactions, and that other similar transactions carried on by a defendant are sufficient to prove guilty knowledge and criminal intent."'" (*People v. Singh*, *supra*, 37 Cal.App.4th at p. 1371.)  The People presented evidence Priscilla treated patients referred to her by other persons involved in the scheme (including relatives), rendered identical diagnoses (often containing unusual neurological findings) for patients in the same and different collisions, reported extensive treatment for those injuries, yet never billed for, or ordered, X-rays of the patients or referred them to other medical professionals.  Three of the patients for whom she billed insurers large amounts testified at trial they were not injured or received far less treatment than reported.  In one instance, she reported treating a particular patient beginning five days before the accident.  In another her records purport to show she treated a patient a day before the reported date of the accident and additionally failed to disclose as required she had previously treated the patient for a similar injury.  In addition, the People's expert witness on chiropractic treatment testified that all of Priscilla's reports contained fabricated narratives.  Under these circumstances we have no difficulty concluding the evidence amply supported the jury's conclusion Priscilla acted with the requisite intent to defraud.

---

[20]     Priscilla also suggests she could not be guilty based on counts for incidents in which she received no payment.  This is simply wrong; the crime of presenting a fraudulent claim is ordinarily complete the moment the claim is made to the insurance company, whether or not payment is ultimately received.  (See, e.g., *People v. Zanoletti* (2009) 173 Cal.App.4th 547, 560 ["Insurance fraud under section 550 is . . . concerned with the means, rather than the end.  As defined in subdivision (a)(5), the crime is complete when an individual '[k]nowingly prepare[s], make[s], or subscribe[s] any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.'  Under subdivision (a)(1), the crime is complete when a fraudulent claim is 'presented.'"].)

7. *Delilah's Convictions Were Supported by Substantial Evidence; the People Were Not Required To Prove the Existence of Overt Acts for Counts 25, 40 and 44*

Delilah contends her convictions on counts 25, 40 and 44 were not supported by substantial evidence because the People failed to establish overt acts in support of the conspiracy allegations contained in the charging information.[21] Delilah has misconceived the effect of the allegations of conspiracy and the lack of jury findings of overt acts with respect to those counts.

Delilah was charged with four counts of insurance fraud.[22] Each count alleged that between certain dates Delilah and others "did aid, abet, solicit, conspire with another and did knowingly present and cause to be presented a false and fraudulent claim . . . ." None of the defendants was charged with the crime of conspiracy; instead, the jury was given an uncharged conspiracy instruction based on CALJIC No. 6.10.5.[23]

---

[21]     As the prosecutor explained to the court, the three-year statute of limitations precluded findings of guilt for many of the counts under a conspiracy theory. (See § 801; *People v. Prevost* (1998) 60 Cal.App.4th 1382, 1401 ["[c]riminal conspiracy is governed by a three-year statute of limitations"].) Accordingly, verdict forms required findings on overt acts only for those counts (30, 49, 51, 60 and 61) falling within the statutory period.

[22]     A person is guilty of insurance fraud in violation of section 550, subdivision (a)(1), if he, "with the specific intent to defraud, either directly and actively or aids and abets, solicits, or conspires with any person to . . . [k]nowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury . . . under a contract of insurance." (CALJIC No. 15.40.)

[23]     CALJIC No. 6.10.5 provides: "A conspiracy is an agreement between two or more persons with the specific intent to agree to commit the crime of [insurance fraud], and with the further specific intent to commit that crime, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement. Conspiracy is a crime, but is not charged as such in this case. . . ."

Elsewhere, the jury was instructed, "Before you may return a guilty verdict as to any defendant of the crime of insurance fraud as part of a conspiracy, you must unanimously agree and find beyond a reasonable doubt, that (1) there was a conspiracy to commit the crime of insurance fraud and (2) the defendant willfully, intentionally and knowingly joined with any other or others in the alleged conspiracy. You must also unanimously agree and find beyond a reasonable doubt, that an overt act was committed by one of the conspirators. You are not required to unanimously agree as to who committed an overt act,

26

The combination of these instructions was entirely proper: "When a statute . . . lists several acts in the disjunctive, any one of which constitutes an offense, the complaint, in alleging more than one of such acts, should do so in the conjunctive to avoid uncertainty." (*In re Bushman* (1970) 1 Cal.3d 767, 775, disapproved on another ground in *People v. Lent* (1975) 15 Cal.3d 481, 486, fn. 1.) As Justice Corrigan explained in a recent concurring opinion, "the use of the conjunctive 'and' is not a 'fact' alleged in the accusatory pleading. Nor does it effectively incorporate one theory of an offense into another for the purpose of defining the elements of the charged crime. When multiple theories of committing an offense are involved, the prosecution, by pleading the statute in the conjunctive, puts the defendant on notice that he may face conviction under either theory. The prosecution does not, however, assume the burden of proving each theory." (*People v. Smith* (2013) 57 Cal.4th 232, 247-248 (conc. opn. of Corrigan, J.); see also *Bushman,* at p. 775 ["[m]erely because the complaint is phrased in the conjunctive . . . does not prevent a trier of fact from convicting a defendant if the evidence proves only one of the alleged acts"]; *People v. Lopez* (2005) 129 Cal.App.4th 1508, 1532-1533 ["When a crime can be committed in more than one way, it is standard practice to allege in the conjunctive that it was committed every way. Such allegations do not require the prosecutor to prove that the defendant committed the crime in more than one way."].)

---

or which overt act was committed, so long as each of you finds beyond a reasonable doubt, that one of the conspirators committed one of the acts alleged in the information to be overt acts. [¶] The overt acts alleged are listed in the verdict forms as to Counts 30, 49, 51, 60 and 61." (See CALJIC No. 6.22.)

"It is long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator. [Citations.] 'Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory.'" (*People v. Belmontes* (1988) 45 Cal.3d 744, 788-789, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.)

27

Ultimately, "[t]he test for determining whether instructions on a particular theory of guilt are appropriate is whether there is substantial evidence which would support conviction on that theory. [Citation.] To determine whether there is substantial evidence to support a conviction we must view the record in a light most favorable to conviction, resolving all conflicts in the evidence and drawing all reasonable inferences in support of conviction. We may conclude that there is no substantial evidence in support of conviction only if it can be said that on the evidence presented no reasonable fact finder could find the defendant guilty on the theory presented." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 528-529.)

The evidence presented at trial was more than sufficient to convict Delilah of the charged offenses on any of the theories incorporated in the court's instructions. Section 550, subdivision (a), allowed the jury to convict any of the defendants of insurance fraud based on actions that "either directly and actively" or by "aid[ing] and abet[ting]" or by "solicit[ing]" or by "conspir[ing] with" another person to present a fraudulent insurance claim. As instructed, the jury was authorized to convict Delilah on count 60 based on a conspiracy theory and on counts 25, 40 and 44 under a direct or aiding and abetting theory. That the jury attended to these instructions and considered each count carefully is patent: One defendant was entirely acquitted, and Priscilla was acquitted of four of the 14 counts against her. The evidence against Delilah was ample, and the verdicts against her demonstrate the jury did not accept Delilah's defense the claims were made without her knowledge.

8. *Delilah Was Not Entitled to a Jury Trial on the Award of Direct Victim Restitution*

Delilah contends the trial court's award of direct victim restitution[24] violated her Sixth Amendment right to a jury trial, reasoning the restitution order constituted

---

[24] Section 1202.4, subdivision (a)(1), provides that "a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from any defendant convicted of that crime." Section 1202.4, subdivision (f), states that, subject to certain exceptions not applicable here, "[I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that

28

additional punishment that could not be imposed without jury findings beyond a reasonable doubt under the rationale of *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435] (*Apprendi*) and its progeny.

In *Apprendi, supra,* 530 U.S. 466, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id.* at p. 490; see also *Blakely v. Washington* (2004) 542 U.S. 296, 304 [124 S.Ct. 2531, 159 L.Ed.2d 403] ["[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." (Italics omitted.) It follows that a judgment may not "inflict[] punishment that the jury's verdict alone does not allow."].)

In *Southern Union Co. v. United States* (2012) 567 U.S. ___ [132 S.Ct. 2344, 183 L.Ed.2d 318] (*Southern Union*) the Court extended the rule of *Apprendi* to the imposition of criminal fines. (*Southern Union,* 132 S.Ct. at p. 2357.) The statutory fine imposed in *Southern Union* was $50,000 for each day of violation; the trial court, rather than the jury, determined the number of days of violation. Because the amount of the fine was directly tied to the number of days of violation, the Court held the trial court's factual finding violated *Apprendi*. (*Southern Union,* 132 S.Ct. at pp. 2354, 2357.)

---

the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court. . . . The court shall order full restitution unless it finds compelling and extraordinary reasons for not doing so, and states them on the record." Restitution "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct . . . ." (§ 1202.4, subd. (f)(3).)

Although a defendant is entitled to a restitution hearing to "dispute the determination of the amount of restitution" (§ 1202.4, subd. (f)(1)), Delilah waived her right to such a hearing in this case. The People argue she has thus forfeited her right to appellate review. (See *People v. Williams*, *supra*, 16 Cal.4th at p. 250 [constitutional objections not properly raised are forfeited].) We choose to address her claim on the merits but recognize forfeiture as an alternate ground for affirmance.

Contrary to Delilah's claim, however, *Southern Union* does not mandate a jury trial for direct victim restitution awards. Unlike the criminal fine in *Southern Union* the restitution awarded here is direct victim compensation, not a fine.[25] The California Constitution provides in relevant part that "[r]estitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss." (Cal. Const., art. I, § 28, subd. (b)(13)(B).) Subdivision (f) of section 1202.4 simply implements the constitutional directive to require restitution for crime victims. A court must order "full restitution unless it finds compelling and extraordinary reasons for not doing so, and states them on the record." (§ 1202.4, subd. (f).) "If, as a result of the defendant's conduct, the Restitution Fund has provided assistance to or on behalf of a victim . . . , the amount of assistance provided shall be presumed to be a direct result of the defendant's criminal conduct and shall be included in the amount of the restitution ordered." (§ 1202.4, subd. (f)(2), (4)(A).)

At this juncture, virtually every court that has considered this question has concluded that *Southern Union* and other *Apprendi* progeny do not apply to direct victim restitution because victim restitution is not a criminal penalty. (See, e.g., *People v. Pangan* (2013) 213 Cal.App.4th 574, 585-586 [discussing California and federal cases]; *People v. Millard* (2009) 175 Cal.App.4th 7, 35 ["the primary purpose of a victim restitution hearing is to allow the People to prosecute an expedited hearing before a trial court to provide a victim with a civil remedy for economic losses suffered, and not to

---

[25] Direct victim restitution and restitution fines are distinct. (See *People v. Villalobos* (2012) 54 Cal.4th 177, 181.) "[S]ection 1202.4, subdivisions (a) and (f) require every person convicted of a crime to pay restitution directly to the victim in an amount equal to the economic loss suffered by the victim as a result of the defendant's conduct. . . . Separate and apart from restitution, section 1202.4, subdivision (b) requires every person convicted of a crime to pay a restitution fine: 'In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so, and states those reasons on the record.' A restitution fine is not paid by the defendant directly to the victim. Instead, it 'shall be deposited in the Restitution Fund in the State Treasury' (§ 1202.4, subd. (e)), from which crime victims may obtain compensation through an application process (see Gov. Code, §§ 13950-13960)." (*Id.* at pp. 181-182.)

punish the defendant for his or her crime"]; *People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1184 [same]; cf. *People v. Harvest* (2000) 84 Cal.App.4th 641, 645, 650 [victim restitution does not constitute punishment for double jeopardy purposes].)  As these courts have uniformly recognized, "[t]o the extent a victim restitution order has the secondary purposes of rehabilitation of a defendant and/or deterrence of the defendant and others from committing future crimes, those purposes do not constitute increased punishment of the defendant."  (*Millard*, at pp. 35, 36; accord, *Pangan*, at p. 585; *Chappelone,* at p. 1184; but see Acker, *The Mandatory Victims Restitution Act Is Unconstitutional:  Will the Courts Say So After Southern Union v. United States?* (2013) 64 Ala. L.Rev. 803.)  Until either of the Supreme Courts directs otherwise, we follow this substantial authority.

> 9.  *The Omission of CALJIC No. 15.26 on Specific Intent To Defraud Was Not Error*

The trial court must instruct the jury on all general principles of law necessary to properly perform its function:  "'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.'"  (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)

"In reviewing any claim of instructional error, we must consider the jury instructions as a whole, and not judge a single jury instruction in artificial isolation out of the context of the charge and the entire trial record. [Citations.]  When a claim is made that instructions are deficient, we must determine whether their meaning was objectionable as communicated to the jury.  If the meaning of instructions as communicated to the jury was unobjectionable, the instructions cannot be deemed erroneous. [Citations.]  The meaning of instructions is no longer determined under a strict test of whether a 'reasonable juror' *could* have understood the charge as the defendant asserts, but rather under the more tolerant test of whether there is a 'reasonable likelihood' that the jury misconstrued or

31

misapplied the law in light of the instructions given, the entire record of trial, and the arguments of counsel." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276 (*Dieguez*); see *People v. Clair* (19912) 2 Cal.4th 629, 663; see generally *Estelle v. McGuire* (1991) 502 U.S. 62, 72 [112 S.Ct. 475, 116 L.Ed.2d 385].) "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) "A miscarriage of justice occurs only when it is reasonably probable that the jury would have reached a result more favorable to the appellant absent the error." (*Dieguez,* at pp. 277-278.)

Delilah contends the trial court erred by omitting CALJIC No. 15.26, which defines "specific intent to defraud."[26] In the context of workers' compensation fraud (see Ins. Code, § 1871.4),[27] the *Dieguez* court rejected a similar argument that the trial court's failure to instruct on specific intent to defraud required reversal of the appellant's conviction: "Because the language of section 1871.4, subdivision (a)(1) is clear and unambiguous, there is no need to insert a superfluous additional specific intent requirement." (*Dieguez, supra,* 89 Cal.App.4th at p. 279.) "[I]ntent to defraud is actually 'built into' the language of the instruction given by the trial court" because "a jury *necessarily* finds an intent to defraud" when it determines a defendant "specifically intended to obtain workers' compensation by means of knowingly making false or fraudulent material statements." (*Id.* at p. 279; see *People v. Blick* (2007) 153 Cal.App.4th 759, 773-774.) "In other words, there was no error for failure to instruct

---

[26] CALJIC No. 15.26 provides: "An intent to defraud is an intent to deceive another person for the purpose of gaining some material advantage over that person or to induce that person to part with property or to alter that person's position to his injury or risk, and to accomplish that purpose by some false statement, false representation of fact, wrongful concealment or suppression of truth, or by any other artifice or act designed to deceive."

[27] Insurance Code section 1871.4, subdivision (a)(1), makes it unlawful to "[m]ake or cause to be made a knowingly false or fraudulent material statement or material representation for the purpose of obtaining or denying any compensation, as defined in Section 3207 of the Labor Code."

on specific intent to defraud when the specific intent required for the offense was actually spelled out in the statute and instruction." (*Blick,* at p. 774 [discussing *Dieguez*].)

In this case, the jury was instructed under CALJIC No. 3.31, which, as given, provides: "In the crimes of perjury and insurance fraud, there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless this specific intent exists the crime to which it relates is not committed. [¶] The specific intent required is included in the definitions of the crimes set forth elsewhere in these instructions." The jury was also instructed under CALJIC No. 15.40, as follows: "Every person who, with specific intent to defraud, either directly and actively, or aids and abets, solicits, or conspires with any person to knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance, is guilty of a violation of Penal Code section 550, subdivision (a)(1), a crime. [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A person either directly and actively or aided and abetted, solicited, or conspired with another person to knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance; and [¶] 2. That person acted with the specific intent to defraud."

We find *Dieguez* persuasive under the circumstances presented here. The phrase intent to defraud is not a technical legal term; to the contrary, it is a term of common use and knowledge. (See *People v. Hardy* (1992) 2 Cal.4th 86, 153 [trial court's failure to include legal definition and elements of "fraud" and "specific intent to defraud" did not amount to error because the terms are in common use and of common knowledge].) To conclude the defendants in this case were guilty of insurance fraud, the jury was required to find they acted with the specific intent to defraud insurers by knowingly presenting or causing to be presented false or fraudulent claims for the payment of a loss or injury under an insurance contract. Reading CALJIC No. 15.26 would have added little to the jury's understanding of its task, and it necessarily found an intent to defraud when it

33

convicted defendants of the crime of insurance fraud. (See *Dieguez, supra,* 89 Cal.App.4th at pp. 279-280.)[28]

10. *Priscilla's Sentence Must Be Modified To Impose a One-year Enhancement Under Section 186.11, Subdivision (a)(1)*[29]

As the People concede, the trial court erred in imposing a two-year sentence enhancement based on the jury's findings Curtis and Priscilla had engaged in felony conduct involving "the taking of more than $100,000" within the meaning of section 186.11, subdivision (a)(1), which directs imposition of a sentence enhancement "as specified in paragraph (2) or (3)."[30]

Section 186.11, subdivision (a)(3), provides that a "pattern of felony conduct involv[ing] the taking of . . . more than [$100,000], but not more than [$500,000], the additional term of punishment shall be the term specified in [section 12022.6]." Section 12022.6, subdivision (a)(1) and (a)(2), provide for an additional term of one year if the loss exceeds $65,000 and two years if the loss exceeds $200,000.

---

[28] The comments to CALJIC No. 15.40 do not mandate the use of CALJIC No. 15.26, although the companion instruction for medical insurance fraud (CALJIC No. 15.41.3) does. Even if the trial court erred in failing to give CALJIC No. 15.26, any such error was harmless beyond a reasonable doubt under the circumstances of this case. (See *Chapman v. California, supra,* 386 U.S. at p. 24.)

[29] This argument was raised by Curtis and joined by Priscilla pursuant to California Rules of Court, rule 8.200(a)(5). As provided in that rule, both Priscilla and Delilah joined the arguments of their codefendants to the extent those arguments favored them. We have reviewed each of the claims discussed above in light of their joinder but have found no other instance in which our resolution of the claim favors another defendant.

[30] Section 186.11, subdivision (a)(1), provides: "Any person who commits two or more related felonies, a material element of which is fraud or embezzlement, which involve a pattern of related felony conduct, and the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than one hundred thousand dollars ($100,000), shall be punished, upon conviction of two or more felonies in a single criminal proceeding, in addition and consecutive to the punishment prescribed for the felony offenses of which he or she has been convicted, by an additional term of imprisonment in the state prison as specified in paragraph (2) or (3). This enhancement shall be known as the aggravated white collar crime enhancement. The aggravated white collar crime enhancement shall only be imposed once in a single criminal proceeding. . . ."

34

The only jury finding here is that Priscilla's takings exceeded $100,000. Accordingly, the sentence enhancement imposed under section 186.11, subdivision (a)(1), should have been limited to one year, not two years.

## DISPOSITION

The judgment as to Delilah Lafawn Johnson is affirmed. The judgment as to Priscilla Conner is modified to reflect a one-year white collar crime enhancement, rather than a two-year enhancement, and is affirmed in all other respects. The appeal of Curtis Conner is dismissed. The superior court is directed to prepare a corrected abstract of judgment as to Priscilla Conner and forward it to the Department of Corrections and Rehabilitation.


PERLUSS, P. J.

We concur:


WOODS, J.


ZELON, J.